IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| Kennith Jacobson, | ) | Case No.  08 C 50173 |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Magistrate Judge |
| | ) | P. Michael Mahoney |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

## I.       Introduction

Kennith Jacobson seeks judicial review of the Social Security Administration

Commissioner's decision to deny his application for Disability Insurance Benefits ("DIB") under

Title II of the Social Security Act.  *See* 42 U.S.C. § 405(g).  This matter is before the magistrate

judge pursuant to the consent of both parties, filed on October 27, 2008.  *See* 28 U.S.C. § 636(c);

Fed. R. Civ. P. 73.

## II.      Administrative Proceedings

Claimant first filed for DIB on or about March 23, 2006.  (Tr. 58–60.)  He alleges a

disability onset date of June 14, 2004.  (Tr. 58.)  His claim was denied initially and on

reconsideration.  (Tr. 6, 24–26.)  The Administrative Law Judge ("ALJ") conducted a hearing

into Claimant's application for benefits on February 6, 2008.  (Tr. 10.)  At the hearing, Claimant

was represented by counsel and testified.  (Tr. 323–367.)  Linda Gels, a vocational expert, also

testified at the hearing.  (Tr. 358–67.)  The ALJ issued a written decision denying Claimant's

application on February 27, 2008, finding that jobs existed in significant numbers in the national economy that Claimant could perform.  (Tr. 10–17.)  Because the Appeals Council denied Claimant's Request for Review regarding the ALJ's decision, that decision constitutes the final decision of the Commissioner.  (Tr. 1–5.)

## III.    Background

Claimant was born on October 9, 1961, making him 47 years old at the time of his hearing.  (Tr. 327.)  He completed two months of the ninth grade.  (Tr. 327.)  On June 14, 2004, Claimant slipped on an unstable board at work and fractured his left foot in multiple places.  (Tr. 150.)  He alleges that he still experiences swelling and pain in the foot.  He rated the pain that he usually feels as a "seven" on a scale of one to ten, but stated that it can be more.  (Tr. 334–35, 346.)  Claimant testified that standing more than ten minutes or walking for too long aggravates the pain and causes his foot to pulsate and throb.  (Tr. 336.)  Claimant testified that after he walks a little ways into the grocery store from his truck, he must sit down.  (Tr. 336.)  He testified that sitting without moving his foot causes it to throb.  (Tr. 337.)  Elevating his foot tends to relieve the swelling and pain.  (Tr. 347.)  Claimant takes Aleve and Tylenol, which bring the pain down to about a "five" on a one to ten scale.  (Tr. 348.)

From 1986 until 1996, Claimant was employed laying blacktop.  (Tr. 78.)  In that job, he was required to walk and stand 10–12 hours per day.  (Tr. 79.)  From 1996 until June 14, 2004, Claimant worked as a "cut guy" for MC Builders.  (Tr. 78, 329.)  In that job, Claimant cut and carried pieces of lumber that were later used in construction.  (Tr. 329.)  He testified that he would have to carry 10 or 15 pounds at a time.  (Tr. 330.)  Claimant testified that he worked one day at the GCA Nuclear Facility as a custodian, but that his foot bothered him such that he did

not return after the first day.  (Tr. 355.)

Since he became unemployed, Claimant testified that his day usually consists of waking up and walking out to his garage where he lights a wood burning stove and watches television. (Tr. 341.)  He is able to watch and concentrate on television programs.  (Tr. 342.)  He testified that he occasionally reads, but that it takes him quite a while to get through a book.  (Tr. 342.)  He spends time cleaning his garage and hanging stuff on the walls.  (Tr. 350.)  Claimant testified that he mowed the lawn a couple of times the summer before the hearing, but that the vibrations hurt his foot and that his brother usually mows the lawn.  (Tr. 345.)

Claimant testified that he takes out the trash once in an while, and that he occasionally grills.  (Tr. 352.)  He does the dishes.  (Tr. 353.)  His girlfriend does the grocery shopping, and he will accompany her to the grocery store sometimes.  (Tr. 352.)  Claimant also testified that he likes to boat, that he stores a boat where he lives, but that he does not help take it out or put it back into storage or the water.  (Tr. 352–53.)

Claimant testified that he drinks alcohol four or five times per week.  (Tr. 351.)  When he does drink, he drinks about eight beers over the course of the day.  (Tr. 351.)  He no longer drives due to a several DUI convictions.  (Tr. 120, 344.)

**IV.     Medical Evidence**

Claimant's relevant medical history begins on June 14, 2004.  (Tr. 150.)  Claimant injured his left foot when he slipped on an unstable board at work.  (Tr. 150.)  He was taken to the emergency room and seen by Dr. McCarty.  (Tr. 150.)  X-rays at that time showed fractures of the second, third, and fourth metatarsals proximally, and a fracture of the cuboid.  (Tr. 150.)  His left ankle was sprained.  (Tr. 150.)  Dr. McCarty advised elevating the foot and exercising,

and indicated that Claimant could engage in partial weight bearing on his heel only. (Tr. 150.)
Dr. McCarty prescribed Claimant Vicodin and advised the use of crutches. (Tr. 150.)

Claimant returned to Dr. McCarty for a follow-up on July 22, 2004. (Tr. 150.) At that
time, he still had moderate swelling of the foot and local tenderness. (Tr. 150.) Ankle motion
was improving but was still somewhat limited, and forefoot motion was moderately restricted.
(Tr. 150.) X-rays showed that the fractures in the second, third, and fourth metatarsals, and the
fracture in the cuboid, were all healing. (Tr. 150.) Dr. McCarty refilled Claimant's Vicodin, and
recommended that Claimant limit weightbearing on his left foot. (Tr. 150.)

Dr. McCarty saw Claimant again on August 19, 2004. (Tr. 151.) Claimant indicated that
he was beginning to walk again with some regularity, but that he did not have a good push-off
and that he had a significant limp. (Tr. 151.) Mechanical motion of the foot was improving, and
the swelling was going down. (Tr. 151.) X-rays showed that the fractures were healing. (Tr.
151.) Claimant still required "stronger pain medication with increased activities." (Tr. 150.)
Dr. McCarty indicated that Claimant could still not perform his regular work duties, but that he
could perform duties that required sitting and limited standing with no climbing, squatting, or
kneeling. (Tr. 151.)

On September 21, 2004, Claimant returned to Dr. McCarty. (Tr. 151.) Dr. McCarty
noted that Claimant was slowly improving but that he still could not stand for a prolonged period
of time, and that he would experience a "throbbing sensation . . . for a period of time briefly
throughout the day." (Tr. 151.) Claimant's range of motion was approaching normal, but
Claimant still experienced some discomfort. (Tr. 151.) X-rays showed that the fractures were
healing without complication. (Tr. 151.) Dr. McCarty advised Claimant to continue physical

therapy, and indicated that Claimant should stay off work for another four weeks.  (Tr. 151.)

Claimant saw Dr. McCarty again on October 19, 2004.  (Tr. 151.)  Claimant told Dr. McCarty that he was still experiencing pain and a throbbing discomfort.  (Tr. 151.)  Dr. McCarty noted that Claimant had limited motion, and a mild restriction of flexion and extension.  (Tr. 151.)  X-rays showed that Claimant's fractures were still healing without evidence of complications.  (Tr. 151.)  Claimant indicated to Dr. McCarty that he was not able to do his regular construction work.  (Tr. 151.)  Dr. McCarty referred Claimant to Dr. White for input regarding Claimant's subjective pain and inability to work.  (Tr. 151.)

Claimant visited Dr. White on November 2, 2004.  (Tr. 152.)  Dr. White noted that Claimant had some enlargement around the midfoot, and that he was tender over the lateral side of the foot in the area of the 4–5 tarsometatarsal joints.  (Tr. 152.)  Motion of the 4–5 tarsometatarsal joints was painful.  (Tr. 152.)  The metatarsophalangeal joints had normal motion and no tenderness.  (Tr. 152.)  Claimant's ankle could dorsiflex to neutral, and subtalar motion was not painful.  (Tr. 152.)  Dr. White determined that the ankle joint was stable.  (Tr. 152.)  Dr. White wrote that it could be "several months or perhaps even a year before pain [had] completely resolved."  (Tr. 152.)  He noted, however, that there was no indication for operative intervention.  (Tr. 152.)  He suggested a Supra-Malleolar Orthosis ("SMO") or Arizona ankle brace for better stability and weightbearing.  (Tr. 152.)

On December 2, 2004, Claimant returned to Dr. McCarty indicating that the SMO helped with certain activities on smooth, level surfaces, but that walking on uneven ground still was not very well tolerated.  (Tr. 152.)  Dr. McCarty noted that mechanical motion of the left ankle and foot was improving, but was still limited and slightly uncomfortable.  (Tr. 152.)  Dr. McCarty

indicated that Claimant could not yet go back doing his previous work in construction, but that he could "be involved in sitting activities." (Tr. 152.)

Claimant followed up with Dr. McCarty on March 3, 2005. (Tr. 153.) Claimant continued to complain of soreness, swelling, and stiffness in his foot, and stated that he had difficulty walking. (Tr. 153.) X-rays indicated that Claimant's fractures were healed. (Tr. 153.) Dr. McCarty ordered an MRI to help identify sites of active bone marrow edema or stress-related change. (Tr. 153.)

On March 22, 2005, Claimant returned to Dr. McCarty indicating that he could walk longer on flat surfaces than he could in the past, but that he still had discomfort if he walked too long or at too rapid of a pace. (Tr. 153.) He had soreness and stiffness in his foot, and stated that walking two to three blocks aggravated his symptoms. (Tr. 153.) Uneven surfaces were still poorly tolerated. (Tr. 153.) Mechanical motion of the left foot, subtalar motion, inversion, and eversion continued to be moderately restricted. (Tr. 153.) The MRI showed findings consistent with the trauma sustained and the period of time post injury. (Tr. 153.) Dr. McCarty noted that nothing in the MRI was "unusual or unexpected." (Tr. 153.) Dr. McCarty advised Claimant that he "may never be able to return to all of the work activities or the type of work activities that he was previously involved in, and a lesser type of work or some modification of work duties on a permanent basis may be necessary." (Tr. 153.) Dr. McCarty noted that Claimant "[c]ould continue to do sitting work or limited standard work but regular work was still not employable." (Tr. 153.)

Claimant saw Dr. McCarty on June 14, 2005 and indicated that his condition had not changed since March 2005. (Tr. 154.) He still had trouble building, going up and down ladders,

climbing on unlevel surfaces, and walking on uneven ground. (Tr. 154.) Claimant had normal

flexion and extension of the foot, but his subtalar movement was still uncomfortable and slightly

limited. (Tr. 154.) Inversion and eversion of the foot were mildly restricted and uncomfortable.

(Tr. 154.) Dr. McCarty noted that Claimant's residual discomfort would require activity

modification for long term employment. (Tr. 154.)

On July 18, 2005, Claimant was referred to Dr. Eilers of the Physical Medicine and

Rehabilitation Associates by his attorney and underwent an evaluation. (Tr. 194.) At the time,

Claimant was pursuing a worker's compensation claim. Dr. Eilers indicated that Claimant

showed 1+ pitting edema , and that he had pain at the end of inversion and eversion, as well as

with dorsiflexion. (Tr. 196.) Dr. Eilers also noted that Claimant had significant plantar fascial

tenderness on palpation over the plantar fascia of the foot, and had significant myofascial pain.

(Tr. 196.) Dr. Eilers believed that Claimant's condition was permanent and limited him to "light

sedentary work or a sedentary position with limited walking." (Tr. 196.) Dr. Eilers noted that

Claimant would not be able to do any ladder climbing, walk joists, do balanced walking, or walk

on unlevel ground. (Tr. 196.)

At a deposition on November 16, 2005, Dr. Eilers stated, "Basically he is going to be

limited to what we define as light sedentary work, or desk-type work, the ability to alternate sit,

stand and walk at will and to sometimes elevate his extremity as he would need to." (Tr. 284.)

Dr. Eilers further stated, "[A]nything [Claimant] is going to do, its going to be very basic,

sedentary." (Tr. 284.)

On November 23, 2005, Claimant underwent a Functional Capacity Evaluation

performed by Drew Fitzanko, a physical therapist. (Tr. 257.) Fitzanko determined that Claimant

met the "medium" demand classification according to the Dictionary of Occupational Titles. (Tr. 257.) Claimant could sit constantly, and could lift 50 pounds on an occasional basis, 25 pounds on a frequent basis, and 10 pounds on a constant basis. (Tr. 257.) Fitzanko also found that Claimant could only stand and walk on an occasional basis "as tolerated," and could carry, push, and pull on an occasional basis. (Tr. 257.) These limitations were due to the fact that, although Claimant completed the entire walking task during the evaluation, he demonstrated gait deviations throughout and reported an increase in left foot pain. (Tr. 257.) Claimant demonstrated the ability to sit for 40 minutes, stand for 60 minutes, and walk for 30 minutes. (Tr. 265.)

On June 13, 2006, Claimant saw Dr. Ramchandani, a state medical examiner. (Tr. 201.) Dr. Ramchandani noted that Claimant's pain was "sharp to dull aching in the left forefoot, constant, worse on weightbearing, walking one block, standing two hours, cold and damp weather, going up and down the stairs, or lifting 50 pounds." (Tr. 201.) He noted that Claimant had a left-sided limp, had difficulty walking on his heels and toes, and complained of pain in his left foot. (Tr. 201.) Dr. Ramchandani also noted that Claimant did not use a cane or other assistive device. (Tr. 201.) Claimant could squat and get up from a squatting position with support, and could get on and off the examination table without difficulty. (Tr. 201.) Claimant could also dress and undress without assistance. (Tr. 201.) Upon examination of the joints, Dr. Ramchandani did not find evidence of inflammation, but noted that Claimant had slight tenderness involving the left forefoot. (Tr. 202.) Claimant also told Dr. Ramchandani that he smoked two packs of cigarettes per day and drank about six cans of beer per day. (Tr. 201.)

Dr. Marion Panepinto, a non-examining state medical consultant, completed a physical

residual functional capacity assessment regarding Claimant on June 26, 2006. (Tr. 205.) Dr. Panepinto found that Claimant could lift 50 pounds occasionally and 25 pounds frequently, could stand or walk about six hours in an eight hour workday, could sit about six hours in an eight hour workday, and had an unlimited ability to push or pull. (Tr. 206.) She also found that Claimant could climb ramps, stairs, and ladders occasionally, and could balance, stoop, kneel, crouch, and crawl frequently. (Tr. 207.)

In August 2006, a report was generated by Disability Management Network to the insurance company of MC Builders regarding Claimant's worker's compensation claim. In that report, Claimant indicated that he had considered working in mechanical repair or bench work. (Tr. 120.) He also reported that he liked to ride his riding lawn mower, and that he had contacted the Forest Preserve about the possibility of a job mowing. (Tr. 120.) He indicated that he would be interested in a job driving a forklift, if it did not require a driving license. (Tr. 121.) He reported that he liked to read and had read many novels written by Louis L'amour. (Tr. 120.) He attended job interviews when he could, but expressed difficulty in getting to job interviews because he lacked a driver's license. (Tr. 121.)

V.      **Standard of Review**

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). The ALJ's legal conclusions are reviewed de novo. *Binion v. Charter,* 108 F.3d 780, 782 (7th Cir. 1997). However, the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Id.* The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case are entrusted to the Commissioner.

*Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner.").

If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at 782. If the ALJ identifies supporting evidence in the record and builds a "logical bridge" from that evidence to the conclusion, the ALJ's findings are supported by substantial evidence. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). However, if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## VI.      Framework for Decision

"Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2)

whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether any other work exists in significant numbers in the national economy which accommodates the claimant's residual functional capacity and vocational factors. The court will analyze each of these factors to determine whether the Commissioner's decision was supported by substantial evidence.

**VII.    Analysis**

**A.    Step One: Is the Claimant Currently Engaged in Substantial Gainful Activity?**

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he or she is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

In this case, the ALJ found that Claimant "did not engage in substantial gainful activity since June 14, 2004, the alleged onset date of disability." (Tr. 12.) Neither party disputes this determination. As such, the ALJ's Step One determination is affirmed.

**B.    Step Two: Does the Claimant Suffer From a Severe Impairment?**

Step Two requires a determination whether the claimant is suffering from a severe

impairment.[1]  A severe impairment is one which significantly limits the claimant's physical or

mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  The claimant's age,

education, and work experience are not considered in making a Step Two severity determination.

20 C.F.R. § 404.1520(c).  If the claimant suffers a severe impairment, then the inquiry moves on

to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

    In performing the Step Two analysis in this case, the ALJ found that Claimant has the

following impairments: fracture of the left foot with residual pain.  (Tr. 12.)  Because these

medically determinable conditions significantly limit Claimant's ability to perform basic work

activity, the ALJ recognized these impairments as "severe impairments" under 20 C.F.R. §

404.1520(c).  (Tr. 12.)

    Claimant argues that the ALJ erred in not finding that the Claimant is "afflicted with

multiple fractures involving the left foot consisting of comminuted fractures of the [second,

third, and fourth] metatarsals and the cuboid with fractures of the left [third and fourth]

metatarsals extending into the articular surfaces of the toes and ankle joints."  (Pl.'s Mot. 12.)

Claimant seems to be arguing that the ALJ should have given a more specific articulation of his

impairments.  Claimant's argument is misplaced.  The inquiry at Step Two is only whether

Claimant had one or more severe impairments such that the ALJ should proceed to Step Three.

In this case, the ALJ found that Claimant had one or more severe impairments at Step Two, and

she then moved on to Step Three.  Because substantial evidence in the record supports the

---

[1] The claimant need not specify a single disabling impairment, as the Commissioner will
consider combinations of impairments.  *See, e.g.*, 20 C.F.R. § 404.1520(c).  To simplify, this
generic discussion of the Commissioner's decision-making process will use the singular
"impairment" to include both singular and multiple impairments.

conclusion that Claimant had one or more severe impairments, the ALJ's Step Two determination is affirmed.

**C.     Step Three: Does Claimant's Impairment Meet or Medically Equal an Impairment in the Commissioner's Listing of Impairments?**

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. pt. 404, subpt. P, app. 1.  The listings describe, for each of the body's major systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity.  20 C.F.R. § 404.1525(a).  The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry.  *Bowen v. New York*, 476 U.S. 467 (1986).  Accordingly, if the claimant's impairment meets or is medically equivalent to a listed impairment, then the claimant is found to be disabled and the inquiry ends; if not, the inquiry moves on to Step Four.

In performing the Step Three analysis in this case, the ALJ determined that Claimant's impairment did not meet or medically equal the level of severity contemplated for any impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1.  The ALJ found that Claimant did not meet or medically equal Listing 1.02, the listing for major dysfunction of a joint, or Listing 1.06, the listing for fracture of the femur, tibia, pelvis, or one or more of the tarsal bones.  (Tr. 12.)

Both Listings 1.02 and 1.06 require that Claimant demonstrate the "inability to ambulate effectively, as defined in 1.00B2b[.]"  20 C.F.R. pt. 404, subpt. P, app. 1, sec. 1.02(A) & sec. 1.06(B).  Section 1.00B2b states the following:

> Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive

device(s) that limits the functioning of both upper extremities.

To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. pt. 404, subpt. P, app. 1, sec. 1.00(B)(2)(b). The ALJ found that Claimant did not "demonstrate the inability to ambulate effectively contemplated in the listings[.]" (Tr. 12.)

Claimant argues that the ALJ failed to consider Claimant's testimony that he suffers "great pain" when he attempts to walk, can only stand for ten minutes before experiencing severe discomfort, performs virtually no chores, and cannot cut the grass except on a riding lawnmower. Although the ALJ does not specifically address this testimony in her Step Three finding, she considers it in her Step Four analysis. For example, the ALJ considered Dr. McCarty's August 2004 report, which states that Claimant was already starting to walk with some regularity just two months after the accident. The ALJ also considered the March 22, 2005 report, in which Dr. McCarty notes that Claimant could walk longer on flat surfaces than he could in the past, and that he could not walk more than two or three blocks without experiencing increased symptoms. (Tr. 14.) The ALJ also considered Dr. Eilers' July 2005 report, which notes that Claimant's gait was "fair" when ambulating, and that Claimant could perform "light sedentary work or a sedentary position with limited walking." (Tr. 14.) The ALJ relied on Dr. Fitzanko's evaluation, which noted that Claimant could walk for 30 minutes and had completed the "entire walking task" during the evaluation. (Tr. 14.) The ALJ also noted Dr. Ramchandani's report, which

stated that Claimant reported increased pain after walking one block, and that Claimant did not use a cane or other assistive device. (Tr. 15.) Also, the Disability Management Network records contain many reports of Claimant going to job interviews. Those records indicate that Claimant can travel without companion assistance. His main hurdle in traveling was his lack of driver's license, not his injury.

There is substantial evidence in the record to suggest that Claimant can ambulate at least one block, and does not use hand-held assistive devices that limit the functioning of both upper extremities. There is also evidence that he can travel alone, and that he participates in grocery shopping. That evidence was considered by the ALJ in her Step Four determination. The ALJ could have done a better job articulating the relationship of that evidence to Listings 1.02 and 1.06 in her Step Three determination, but her analysis is sufficient in this case. The court affirms the ALJ's Step Three determination.

**D.      Step Four: Is the Claimant Capable of Performing Work Which the Claimant Performed in the Past?**

At Step Four, the Commissioner determines whether the claimant's residual functional capacity ("RFC") allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his or her impairment. 20 C.F.R. § 404.1545(a). The RFC assessment is based upon all of the relevant evidence, including objective medical evidence, treatment, physicians' opinions and observations, and the claimant's own statements about her limitations. *Id.* Although medical opinions bear strongly upon the determination of RFC, they are not conclusive; the determination is left to the Commissioner who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *see Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th

Cir. 1995).

When assessing the credibility of a claimant's statements about his or her symptoms, including pain, the ALJ should consider the following in addition to the objective medical evidence: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication that the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. Social Security Ruling 96-7p; *see* 20 C.F.R. § 404.1529(c).

Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565(a); Soc. Sec. Rul. 82-62. If the claimant's RFC allows him to return to past relevant work, the claimant will not be found disabled; if the claimant is not able to return to past relevant work, the inquiry proceeds to Step Five.

In performing the Step Four analysis, the ALJ determined Claimant's RFC to be the following: "The claimant can lift no more than 50 pounds occasionally or 25 pounds frequently, stand and/or walk more than occasionally, and cannot perform postural activities such as bending, squatting, kneeling and crouching more than occasionally." (Tr. 12.)

In making her RFC determination, the ALJ considered Claimant's testimony regarding his pain. The ALJ noted Claimant's testimony that he is unable to stand or walk for any period

of time without severe pain.  (Tr. 12.)  She also considered his testimony that pain is present in

his left foot "pretty much all the time," that it is usually a "seven" on a scale of one to ten, and

that it is aggravated by walking.  (Tr. 12–13.)  She noted Claimant's testimony that his foot

begins to throb, pulsate, and feel hot after ten minutes of standing, and that he has to move his

foot around after 5 minutes of sitting or else it begins to throb.  (Tr. 13.)  Claimant also testified

that lifting amounts that put weight on his left foot causes pain, but that he could carry a gallon

of milk with his right hand without it causing pain.  (Tr. 13.)  Claimant stated that he cannot

handle uneven surfaces and cannot walk up the little hill in his backyard, although he stated that

he could walk down it.  (Tr. 13.)

The ALJ considered Claimant's testimony that he takes Aleve and Tylenol for his pain,

but that it only brings his pain down to a "five" on a scale of one to ten.  (Tr. 13.)  The ALJ

noted that Claimant's treating physician never recommended that he go to a pain specialist.  (Tr.

13.)  The ALJ also noted Claimant's testimony that he occasionally elevates his leg or uses ice to

reduce the swelling and pain in his foot.  (Tr. 13.)  Claimant testified that he does this after he

has been on his foot for too long, which occurs every few days.  (Tr. 13.)

The ALJ considered Claimant's testimony regarding his activities of daily living.

Claimant testified that he often goes into the garage, where he lights a wood burning stove and

watches television.  (Tr. 13.)  He also testified that he sometimes reads, but that it takes him

quite a while to read a book.  (Tr. 13.)  The ALJ noted that Claimant testified to spending his

days "puttering around" the house and hanging things, but claimed to have not done any

woodworking since the injury.  (Tr. 13.)  The ALJ also noted that Claimant testified that he

occasionally cooks on the grill and accompanies his girlfriend to the grocery store.  (Tr. 13.)  The

ALJ further considered that Claimant goes out on a pontoon boat, but that he does not help put the boat in or take it out of the water.  (Tr. 13.)

The ALJ considered the objective medical evidence in the record.  Th ALJ noted Dr. McCarty's June 2004 report, which indicated that Claimant had fractured his left foot in multiple places and sprained his left ankle.  (Tr. 13.)  The ALJ noted that Dr. McCarty instructed Claimant to only bear weight on the heel of the foot, to elevate his foot, and to exercise.  (Tr. 13.)  Dr. McCarty prescribed Vicodin at that time.  (Tr. 13.)  The ALJ noted that, about a month later, Claimant presented to Dr. McCarty with moderate swelling, local tenderness, and somewhat limited ankle motion, but that x-rays indicated that the fractures were healing.  (Tr. 13.)  The Vicodin prescription was also renewed at that time.  (Tr. 13.)

The ALJ took into account Dr. McCarty's August 2004 report, which indicated Claimant was starting to walk on his heel with regularity, although he had a significant limp.  (Tr. 13.)  The report also indicated that x-rays showed that Claimant's fractures were continuing to heal, and that no complications had arisen.  (Tr. 13.)  The ALJ noted that Claimant still required strong medications with increased activities.  (Tr. 13.)  The report indicated that Claimant's work was limited to "sitting, limited standing, and no climbing, squatting or kneeling."  (Tr. 13.)

The ALJ considered the September 2004 report by Dr. McCarty, which showed further "slow improvement," but indicated that Claimant still reported that he could not stand for prolonged periods of time.  (Tr. 13–14.)  The ALJ noted that the range of motion in Claimant's foot was described in the report as approaching normal, and that Claimant was advised to continue with physical therapy sessions.  (Tr. 14.)

The ALJ considered the October, November, and December 2004 reports. Dr. McCarty, in October 2004, continued to report that the fractures were healing with no complications, but that Claimant was experiencing pain and limited motion in the foot. (Tr. 14.) The ALJ noted that Dr. McCarty was somewhat puzzled by Claimant's continued pain, and referred him to Dr. White. The ALJ noted that Dr. White's November 2004 report indicated that a CT scan had been conducted and that Claimant's fractures seemed to be healing. (Tr. 14.) Dr. White saw no reason for surgery at that time, and indicated that Claimant's symptoms might take some time to resolve. (Tr. 14.) The ALJ remarked that Dr. McCarty's December 2004 report suggested that Claimant could work from a sitting position. (Tr. 14.)

The ALJ relied on both March 2005 reports. The first, from March 3, 2005, indicated that flexion and extension of the foot were mildly restricted, but that subtalar motion and inversion and eversion were significantly restricted. (Tr. 14.) The ALJ also relied on x-rays from March 3 that indicated that Claimant's fractures were all healed and that the position of all the affected structures of the left foot were unchanged. (Tr. 14.) The ALJ considered the March 22 report, which noted that Claimant had stated that walking more than two to three blocks caused increased symptoms with some throbbing and burning sensations. (Tr. 14.) The ALJ noted that these symptoms prompted an MRI, which showed nothing unusual or unexpected, other than some marrow edema. (Tr. 14.) Subtle plantar fasciitis was also noted at that time. (Tr. 14.)

The ALJ considered Dr. McCarty's July 2005 report, and noted that Dr. McCarty wrote that Claimant still experienced pain going up and down ladders, walking on uneven ground, and performing the type of activities that he did in his former work. (Tr. 14.) Dr. McCarty indicated

that Claimant had normal flexion and extension, slightly limited subtalar, and mildly restricted inversion and eversion of his left foot.  (Tr. 14.)

The ALJ relied on Dr. Eilers' July 2005 report, which sowed 1+ edema on the side of the foot.  (Tr. 14.)  The report also indicated that Claimant's range of motion was full, but that there was significant plantar fascial tenderness.  (Tr. 14.)  Dr. Eilers wrote that Claimant's gait was "fair" when ambulating, but that there was some weight shifting to the right side.  (Tr. 14.)  The ALJ noted Dr. Eilers' conclusion that Claimant's work should be limited to "light sedentary work or a sedentary position with limited walking."  (Tr. 14.)  The ALJ noted that Dr. Eilers' deposition contained a similar opinion, limiting Claimant to "light sedentary" work, or desk-type work, with the ability to alternatively sit, stand, and walk at will and to sometimes elevate his left foot.  (Tr. 14–15.)

The ALJ relied on the functional capacity evaluation conducted in November 2005 by Dr. Fitzanko.  The ALJ noted that the evaluation found that Claimant could "perform handling tasks involving up to 50 pounds on an occasional basis and 25 pounds on a frequent basis, and up to 10 pounds on a constant basis."  (Tr. 15.)  The ALJ also noted that the evaluation found that Claimant's standing and walking activities should be limited to occasionally because his left foot symptoms and gait and balance deviations increased with prolonged standing and walking.  (Tr. 15.)  The evaluation indicated that Claimant's sitting ability was normal.  (Tr. 15.)

The ALJ considered Dr. Ramchandani's report of June 2006.  Dr. Ramchandani wrote that Claimant's pain was constant though worse with weightbearing, walking one block, standing two hours, going up or down stairs, being in cold or damp weather, or lifting 50 pounds.  (Tr. 15.)  The ALJ noted that Claimant exhibited a left-sided limp and had difficulty walking on his

heels and toes due to left foot pain complaints, but was not using a cane or other assistive device when he saw Dr. Ramchandani. (Tr. 15.) The ALJ also noted that Claimant could squat and get up from a squatting position with support, could get on and off the examining table, and could dress and undress without assistance. (Tr. 15.) The ALJ considered that Dr. Ramchandani's inspection of Claimant's joints found no abnormality except for slight tenderness of the left forefoot. (Tr. 15.) The ALJ also took into account Claimant's statements to Dr. Ramchandani that he smoked two packs of cigarettes per day and drank about six cans of beer per day. (Tr. 15.)

Finally, the ALJ noted the report of Dr. Panepinto, who concluded that Claimant could perform medium work with only occasional climbing of ladders, ramps, stairs, and similar tasks. (Tr. 15.)

After considering the objective medical evidence, the ALJ found that Claimant's statements regarding his limitations were not entirely credible. (Tr. 15.) The ALJ considered that Claimant had a long work history, which weighed in favor of his testimony. (Tr. 15.) However, the ALJ also considered the fact that Claimant had not sought any significant treatment since late 2005, and that he took only a modest amount of over-the-counter pain medication to alleviate his symptoms. (Tr. 15–16.) The ALJ found that these activities were not consistent with a person who is experiencing a great deal of pain. (Tr. 16.)

The ALJ also found that many of the limitations in daily living about which Claimant testified at the hearing were inconsistent with the limitations suggested in the documents that were generated during his worker's compensation claim. The court notes that Claimant actively sought out a job mowing for the park district in August 2006, but testified that he could not mow

his own lawn because the vibrations from the mower hurt his foot. The ALJ's finding that Claimant's statements were not entirely credible is supported by substantial evidence in the record.

The ALJ's RFC determination is also supported by substantial evidence in the record. X-rays conducted in August, September, and October 2004, and a CT scan conducted in November 2004, all indicated that the fractures were healing. An x-ray conducted in March 2005 indicated that the fractures were healed. Dr. McCarty's reports as early as August 2004 suggest that Claimant could perform sedentary work. Reports from December 2004, March, July, and November 2005, and June 2006 all indicated that Claimant could do sedentary work. Dr. Fitzanko's report of November 2005 specifically noted that Claimant could lift up to 50 pounds occasionally, 25 pounds frequently, and 10 pounds constantly. The report of Dr. Panepinto indicated that Claimant could do work at a medium exertional level. The lifting restrictions and walking and standing restrictions in the ALJ's RFC determination are amply support by objective medical evidence in the record, and the ALJ drew a logical bridge from that evidence to her RFC determination.

The ALJ also accounted for Claimant's indication that he must elevate his leg. (Tr. 16.) The ALJ wrote that "the claimant's need to elevate his leg could be accommodated by doing so during normal work breaks, lunch hours, and at home." The court finds this conclusion supported by substantial evidence in the record. The court affirms the ALJ's RFC determination.

The ALJ found that Claimant can not perform his past relevant work because of the standing and walking requirements. Neither party disputes this determination. The court affirms the ALJ's Step Four determination.

**E.      Step Five: Does Any Other Work Exist  in Significant Numbers in the National Economy Which Accommodates the Claimant's Residual Functional Capacity and Vocational Factors?**

At step five, the Commissioner determines whether the claimant's RFC and vocational factors allow the claimant to perform any job which exists in the national economy in significant numbers.  20 C.F.R. § 404.1560(c).  The burden is on the Commissioner to provide evidence that demonstrates that other work exists.  20 C.F.R. § 404.1560(c)(2).  In determining whether other work exists, the Commissioner considers the claimant's RFC and vocational factors in conjunction with the Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, subpt. P, app. 2 (the "Guidelines").  The Guidelines direct a conclusion of "disabled" or "not disabled" upon a finding of a specific vocational profile.  Soc. Sec. Rul. 83-11.  The Guidelines represent exertional maximums, though, and if the claimant cannot perform substantially all of the exertional demands contemplated by the Guidelines, a conclusion cannot be directed without first considering the additional exertional limitations.  Soc. Sec. Rul. 83-11 & 83-12.  A vocational expert's testimony, if it is reliable, can satisfy the Commissioner's burden of determining whether a significant number of jobs exist in the economy.  *Overman v. Astrue*, 546 F.3d 456, 464 (7th Cir. 2008).

The ALJ found that the Guidelines directed a finding of not disabled in this case given Claimant's specific profile.  Claimant was born on October 9, 196, making him 42 years old.  (Tr. 16.)  He is defined as a "younger individual 18–49" by the Guidelines.  (Tr. 16.)  He has a limited education, and is able to communicate in English.  (Tr. 16.)    Transferability of skills is inapposite.  The ALJ found that Claimant's RFC is comparable to "more than full range of sedentary work though less than the full range of light or medium work," and that Medical

Vocation rules 203.26, 202.18, and 201.25 directed a finding of disabled. (Tr. 17); *see* 20 C.F.R. Pt. 404, subpt. P, app. 2, sec. 201.25. The ALJ noted that her conclusion was "supported by the testimony of the vocation expert, who testified that the [RFC] and vocational characteristics leave the claimant with an occupational base greater than that contemplated under section 201.25 for sedentary purposes."

The ALJ's RFC determination is based on substantial evidence in the record and the ALJ properly relied on the vocational expert's testimony. The vocational expert testified Claimant's lifting restrictions of 50 pounds occasionally and 25 pounds frequently would be defined as medium exertional capacity. (Tr. 361.) She testified that if Claimant can stand and walk only occasionally, he could perform sedentary jobs. (Tr. 361.) The vocational expert noted, however, that given Claimant's standing and walking limitation, he would be limited to performing sedentary work despite his lifting restriction. (Tr. 361.) She went on to testify that, given Claimant's RFC, there exists 14,000 jobs in the state-wide economy which Claimant can perform. (Tr. 362.) This testimony is consistent with the ALJ's conclusion.

At the sedentary level, a claimant who is a younger individual with limited or less education, and who's past employment was unskilled, the Guidelines direct a finding of not disabled. The court affirms the ALJ's Step Five determination.

## VIII.  Conclusion

For the forgoing reasons, the Commissioner's motion for summary judgment is granted and Claimant's motion for summary judgment is denied.


**E N T E R:**

_____
**P. MICHAEL MAHONEY, MAGISTRATE JUDGE**
**UNITED STATES DISTRICT COURT**


**DATE**: April 16, 2010